UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CHRISTAL JEAN MILLER,

                        Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

_____

<u>DECISION & ORDER</u>

15-CV-6249P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Christal Jean Miller ("Miller") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 6).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 10, 11).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Miller's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.       Procedural Background

Miller filed for DIB alleging disability beginning on April 14, 2011, as a result of TIA strokes, a cognitive learning disability, and depression. (Tr. 197, 224).[1] On November 9, 2011, the Social Security Administration denied Miller's claim for benefits, finding that she was not disabled. (Tr. 69-88). The decision was reconsidered, and, on January 30, 2012, the Social Security Administration again denied Miller's claim for benefits, finding that she was not disabled. (Tr. 89-105). Miller requested and was granted a hearing before Administrative Law Judge Teresa J. McGarry (the "ALJ"). (Tr. 32, 120-21, 137-42). The ALJ conducted a hearing on July 30, 2013. (Tr. 32-68). Miller was represented at the hearing by her attorney Richard A. Schwartz, Esq. (Tr. 32, 136). In a decision dated August 16, 2013, the ALJ found that Miller was not disabled and was not entitled to benefits. (Tr. 13-31).

On December 19, 2014, the Appeals Council denied Miller's request for review of the ALJ's decision. (Tr. 4-8). Miller commenced this action on April 28, 2015 seeking review of the Commissioner's decision. (Docket # 1).

### II.      Relevant Medical Evidence[2]

#### A.      Treatment Records

##### 1.      Florida Hospital Memorial Division[3]

Treatment notes from this facility date from February 2009. (Tr. 528). At that time, Miller requested a prescription for Percocet to manage her headaches. (*Id.*). On

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.

[3]  Portions of these treatment records are handwritten and difficult, if not impossible, to decipher. Accordingly, the Court has summarized only those portions of these records that are legible.

March 23, 2009, an MRI was taken of Miller's brain due to complaints of left leg weakness. (Tr. 539-40). The MRI revealed multiple small areas of restricted diffusion, which indicated acute infarction involving the corpus callosum and pericallosal region on the right and the right parietal lobe. (*Id.*).

On August 19, 2009, Miller returned for treatment for migraines, chronic obstructive pulmonary disease ("COPD"), and depression. (Tr. 529). Miller returned on September 28, 2009 and reported only one minor headache since her last visit. (Tr. 533). Notes from a visit that occurred on November 24, 2009 indicate that Miller's headaches continued to be better controlled and that she continued to take Prozac for her depression. (Tr. 535-36). On March 12, 2010, Miller called to complain of an ongoing migraine and to request a refill of her prescription for Percocet. (Tr. 521).

On February 15, 2011, Miller met with Jon Bolla ("Bolla"), MD, complaining of ear discomfort. (Tr. 558-60). The treatment notes indicate that Miller's medical history included recurrent major depressive affective disorder, obstructive chronic bronchitis, endometriosis, classical migraine without mention of "intractable" and hyperlipidemia. (*Id.*). Bolla assessed that Miller's blood pressure and depression were stable and noted that she reported only rare headaches. (*Id.*).

Miller returned on March 7, 2011 complaining of a cough. (Tr. 555-57). She reported feeling lightheaded and dizzy and that her chest hurt from coughing. (*Id.*). Bolla assessed moderate, bilateral, diffuse wheezing and prescribed albuterol, prednisone, and amoxicillin. (*Id.*). He advised Miller to stop smoking. (*Id.*).

On April 13, 2011, Miller presented to the emergency room complaining of left leg numbness of fluctuating intensity that she had experienced for two days. (Tr. 468-71). Upon

examination, Miller demonstrated no focal neurological deficits, although she had diminished sensation in her left leg.  (*Id.*).  She was diagnosed with a herniated disk with neuropathy and discharged.  (*Id.*).

On April 14, 2011, Miller attended another appointment with Bolla complaining of back pain and numbness.  (Tr. 553-54).  According to Miller, she was experiencing pain in her lower back that radiated to her left ankle, left calf, and left thigh.  (*Id.*).  She also experienced numbness in her left leg, along with motor weakness.  (*Id.*).

On April 15, 2011, Bolla admitted Miller for inpatient treatment.  (Tr. 472-74).  According to treatment notes, Miller reported that the previous week she had been moving heavy furniture.  (*Id.*).  The day after moving the furniture she experienced severe pain in her back and legs that brought her to her knees.  (*Id.*).  She was eventually able to get up and ambulate, although she experienced a similar incident the following day.  (*Id.*).  Miller reported that her left leg was numb and weak and that she was having difficulty ambulating.  (*Id.*).  She reported that she had gone to the emergency room the day before and had been discharged with instructions to follow up with Bolla.  (*Id.*).

Bolla noted that Miller arrived in a wheelchair and demonstrated severe pain and a clear neurologic deficit.  (*Id.*).  According to Bolla, an image of Miller's lumbar spine demonstrated a disk bulge at L4-5 and L5-S1, without clear herniation, and mild spinal stenosis.  (*Id.*).  Because there was no clear diagnosis and Miller was experiencing a significant level of discomfort, Bolla admitted her for further testing, including an MRI.  (*Id.*).

Miller was discharged on April 15, 2011 after demonstrating significant improvement.  (Tr. 475-76).  An MRI of her lumbar spine demonstrated no disk herniation or stenosis, although she did have a central disk protrusion at L5-S1 with mild central stenosis and

bilateral foraminal stenosis.  (Tr. 457).  Bolla instructed her to follow up as an outpatient and to contact him if her condition worsened.  (Tr. 475-76).  At discharge, Miller was diagnosed with an improved disk herniation, COPD, migraines, and depression and anxiety that were controlled with Xanax and Prozac.  (*Id.*).

Miller was readmitted to the hospital on April 18, 2011.  (Tr. 477-80).  Miller's mother reported that after she had been discharged from the hospital the previous week, Miller demonstrated difficulty playing card games, which she was normally able to play.  (*Id.*).  The following Monday, Miller's mother contacted Bolla's office and an MRI of her brain was ordered.  (*Id.*).  The MRI demonstrated that Miller had suffered a series of small strokes, prompting her readmission to the hospital.  (*Id.*).

Miller did not complain of current headaches and did not demonstrate facial weakness or numbness, speech problems, upper extremity weakness, or right lower leg weakness.  (*Id.*).  Miller did demonstrate difficulty moving her left foot, but not as much difficulty as she previously had experienced.  (*Id.*).  Miller did not appear to be in discomfort, and she was able to communicate clearly and appeared completely oriented.  (*Id.*).  Bolla assessed that she suffered from multiple right-sided strokes, suggestive of embolic disease from either a carotid or cardiac source.  (*Id.*).

On April 19, 2011, Miller underwent a neurological consultation with Olimpio Cunha ("Cunha"), MD.  (Tr. 495-97).  Miller reported that she was feeling better and was better able to move her left leg.  (*Id.*).  Upon examination, Miller demonstrated alertness, with a flat affect, but was oriented and cooperative.  (*Id.*).  She was able to follow commands and her mentation appeared appropriate.  (*Id.*).  She demonstrated slight left facial and left upper extremity weakness and more pronounced weakness in her left leg.  (*Id.*).

Cunha assessed an acute/subacute ischemic stroke involving the right-sided corpus callosum/parietal head region.  (*Id.*).  He recommended statin therapy to reduce her low density lipoprotein level and an echocardiogram.  (*Id.*).  He indicated that he would consider recommending a transesophageal echocardiogram, depending upon the results.  (*Id.*).

On April 21, 2011, Miller was seen by Melchor Gonzalez ("Gonzalez"), MD, for another consultation.  (Tr. 498-501).  Gonzalez noted that Miller was admitted after demonstrating speech difficulties and was believed to have suffered from a cerebrovascular accident caused by an unidentified source.  (*Id.*).  Gonzalez noted that Miller was alert and fully oriented, but demonstrated occasional difficulty formulating answers to questions.  (*Id.*).  Gonzalez was not able to identify the etiology of the cerebrovascular accident.  (*Id.*).  He recommended a holter monitor to rule out significant dysrhythmias and a transesophageal echocardiogram.  (*Id.*).

Miller was discharged by Bolla on April 22, 2011.  (Tr. 502-04).  Bolla reported that Miller had progressively improved during her stay, had recovered strength in her leg, and had not suffered any additional neurological events.  (*Id.*).  Additional MRIs did not show evolution of any new lesions in her brain, a carotid ultrasound was normal, and an echocardiogram, holter monitor evaluation, and transesophageal cardiogram were negative. (*Id.*).  Bolla opined that Miller had suffered multiple, right-sided strokes in the parietal area of her brain.  (*Id.*).  She was placed on aspirin and instructed to continue to receive care on an outpatient basis.  (*Id.*).  He further opined that her hypertension, migraines, COPD, depression, and anxiety were controlled.  (*Id.*).

On May 20, 2011, Miller attended a follow-up appointment with Bolla. (Tr. 550-52).  Bolla's notes indicated that Miller had made "great recovery" from her stroke and

6

that she was feeling well and demonstrated no deficits.  (*Id.*).  Upon examination, Miller demonstrated no gait disturbance or psychiatric symptoms.  (*Id.*).

Miller returned for further monitoring on August 17, 2011.  (Tr. 547-49).  During the appointment, Bolla assessed that Miller suffered from moderate hyperlipidemia, but that she was compliant with her medications.  (*Id.*).  He noted that she reported continued smoking and advised her to quit.  (*Id.*).  With respect to her previous stroke, Bolla noted that her recovery was good, she had not experienced any recurrence, and she did not demonstrate any deficits.  (*Id.*).

On February 1, 2012, Miller attended another appointment with Bolla. (Tr. 544-46).  During the appointment she complained of anxiety, dizziness, headaches, and right hand numbness, particularly while driving.  (*Id.*).  A neurological exam demonstrated intact cranial nerves and no motor or sensory deficits.  (*Id.*).

Miller returned for an appointment with Bolla on December 28, 2012, complaining of headache.  (Tr. 611).  Miller reported that she had been experiencing debilitating pain throughout her head for the previous three days.  (*Id.*).

On February 13, 2013, Miller met with Bolla to monitor her blood pressure, hyperlipidemia, and migraines.  (Tr. 606-10).  According to Bolla, Miller's blood pressure was improving and she did not report chest pain, shortness of breath, or headaches.  (*Id.*).  Miller's hyperlipidemia remained unchanged, and Miller's migraines had improved.  (*Id.*).

Miller attended an appointment with Bolla on April 8, 2013 and presented with anemia.  (Tr. 603-05).  According to the treatment notes, her symptoms had begun over the previous two weeks.  (*Id.*).

### 2.      **Halifax Health**

On February 20, 2013, Miller presented to the emergency room accompanied by law enforcement after texting her friend that she was going to ingest fifty Xanax pills. (Tr. 584-94).  According to treatment notes, Miller reported increased depression after learning that her boyfriend no longer wanted to see her.  (*Id.*).  A physical examination presented essentially normal findings, although she was assessed to have impaired judgment and insight, a depressed mood, and a flat affect.  (*Id.*).  She was assessed to be suffering from depression and was discharged to a psychiatric care facility.  (*Id.*).

### 3.      **Stewart-Marchman Behavioral Healthcare**

On February 21, 2013, Miller was involuntarily admitted for treatment at Stewart-Marchman Behavioral Healthcare.  (Tr. 598-602).  Miller reported one previous hospitalization and outpatient treatment, but that she had not seen a psychiatrist for several months.  (*Id.*).  She also reported one previous suicide attempt, but stated that she could not recall the details.  (*Id.*).  Upon examination, Miller appeared well-groomed with a normal gait. (*Id.*).  Antonio Canaan ("Canaan"), MD, opined that Miller had normal speech, full orientation, appropriate affect, euthymic mood, spontaneous thought processes, relevant and goal-directed thought associations, adequate abstracting abilities, normal thought content, no perceptual distortions, immediate retention and recall impairment, adequate attention and concentration, good insight and adequate judgment.  (*Id.*).  Miller denied current suicidal ideation, and she presented no clinical indication of suicidal risk.  (*Id.*).  Canaan diagnosed Miller with recurrent major depressive disorder and assessed a Global Assessment of Functioning ("GAF") of 63. (*Id.*).  He discharged her to her parents with instructions to attend a follow-up appointment with the outpatient clinic.  (*Id.*).

On March 22, 2013, Miller returned for an appointment with Peggy Marion ("Marion"), ARNP.  (Tr. 595-97).  During the appointment, Miller reported that she had been depressed and angry prior to her hospitalization due to her inability to obtain employment or disability assistance following her mini-stroke in 2011.  (*Id.*).  She reported that she texted her friend that she was going to overdose on Xanax, but that she did not follow through with the threat.  (*Id.*).  Miller reported that she continued to take medication that was prescribed by her primary care physician.  (*Id.*).  Marion referred Miller for additional therapy.  (*Id.*).  She diagnosed her with depressive disorder, not otherwise specified, and assessed a GAF of 50.  (*Id.*).

### B.   **Medical Opinion Evidence**[4]

#### 1.   **Norman E. Hoffman, PhD**

On April 29, 2004, Norman E. Hoffman ("Hoffman"), PhD, administered intelligence testing to Miller.  (Tr. 577-80).  In his report, Hoffman cautioned that his testing results would need to be validated before they could be accepted.  (*Id.*).  According to Hoffman, he administered the DSICA to Miller.  (*Id.*).  The results of that testing indicated that Miller suffered from significant symptoms associated with a mood and anxiety disorder.  (*Id.*).  Additionally, Miller's reading comprehension, reasoning ability, and poor mathematical skills suggested that she suffered from a learning disorder.  (*Id.*).

Hoffman also administered the Bender Gestalt Test to Miller.  (*Id.*).  Hoffman opined that the results of that testing suggested that Miller might demonstrate passivity, withdrawn behavior, fearfulness, covert hostility, or schizoid tendencies.  (*Id.*).  Additionally the results suggested that Miller might be emotional, depressed, or suffer from impulse control, overt

---

[4] A physical Residual Functional Capacity ("RFC") assessment was completed by Jorge Weksler, MD. (Tr. 96-98).  The Court has not summarized this assessment because Miller's physical capabilities are not at issue.

anxiety, or agitation.  (*Id.*).  According to Hoffman, Miller's psychopathology score suggested that she had limited psychological problems.  (*Id.*).

Hoffman also administered the Slosson Full-Range Intelligence Test ("S-FRIT"). (*Id.*).  The test results indicated that Miller had a verbal intelligence quotient ("IQ") of 70, a performance IQ of 64, and a full scale IQ of 62.  (*Id.*).  According to Hoffman, Miller's performance IQ and full scale IQ were within the educationally mentally handicapped range, although he cautioned that her "current IQ probably does not represent her true cognitive abilities due to a chronic difficulty with reading comprehension and integration."  (*Id.*).  Hoffman also administered the WRAT3 to evaluate her academic abilities.  (*Id.*).  The results indicated that Miller's mathematical performance was substantially below her expected grade level, and although her reading score appeared to be within the normal range, her ability to recall and understand what she had read was significantly impaired.  (*Id.*).  Results of coding and digit span sub-tests suggested that Miller would have difficulty taking tests that require adequate reading comprehension and integration and that she would perform better if provided auditory directions. (*Id.*).

Hoffman diagnosed Miller with a reading disorder (dyslexia), mathematics disorder, and he assessed a GAF of 55.  (*Id.*).  Hoffman indicated that Miller suffered from a learning disorder and a below expected level of reading comprehension.  (*Id.*).  According to Hoffman, Miller was able to read aloud, but had difficulty comprehending and discussing what she had read.  (*Id.*).  When prepared material was read to her, however, she did not evidence any difficulty understanding the material.  (*Id.*).  He attributed her academic deficiencies to dyslexia. (*Id.*).  He also ruled out bipolar disorder and recommended cessation of any treatment for bipolar disorder.  (*Id.*).

Hoffman recommended that Miller be permitted to retake the Emergency Medical Technician ("EMT") test with accommodations. (*Id.*). He also recommended that she continue counseling and psychotherapy. (*Id.*).

### 2. Argene K. Danielides, EdS, PhD

On November 22, 2004, Argene K. Danielides ("Danielides"), EdS, PhD, conducted a psychological evaluation of Miller upon referral from Hoffman. (Tr. 574-76). Miller was interested in pursuing further testing because she wanted to pass the EMT examination. (*Id.*). According to Miller, she felt that she knew the information required for the examination, but had difficulty with reading comprehension and the time limit. (*Id.*).

Danielides recounted Miller's academic history, reporting that she began to experience reading difficulties in the first grade. (*Id.*). In the fourth grade, Miller was placed into special education due to academic difficulties, as well as moodiness, reduced impulse control, and temper outbursts. (*Id.*). Eventually, she returned to a regular education setting and graduated from high school. (*Id.*). Since that time, Miller held several jobs including cashier, shelf stocker, station attendant and grocery bagger. (*Id.*). Danielides also noted that Miller reportedly suffered sexual abuse when she was younger. (*Id.*).

Upon examination, Miller presented as cooperative, motivated, and conscientious, although occasionally notably anxious and insecure. (*Id.*). Danielides described Miller as "quite articulate and descriptive regarding recent daily happenings and current events." (*Id.*). According to Danielides, Miller responded best to oral questions, but demonstrated frustration with tasks involving visual memory, speed, or reading comprehension. (*Id.*). She also demonstrated difficulty with tasks requiring calculation, numeric processing, and reasoning. (*Id.*).

Danielides administered the Woodcock Johnson III tests of cognitive ability and achievement.  (*Id.*).  She assessed that Miller's intentional cognitive processing was in the high average range and her automatic cognitive processing was in the low average range.  (*Id.*).  Her performance in comprehension-knowledge and visual-spatial thinking, fluid reasoning, and short-term memory was average.  (*Id.*).  She demonstrated an advanced phonemic awareness and an average working memory capacity.  (*Id.*).  Her oral language skills and listening comprehension skills were average.  (*Id.*).  Danielides opined that Miller's academic skills, ability to apply those skills, and her fluency with academic tasks were all within the average range and that her performance was high average in written expression, average in reading, reading comprehension and written language, and low average in mathematics and math calculation skills.  (*Id.*).

Danielides opined that Miller's difficulties likely stemmed from her ability to process information, affecting both her comprehension and performance.  (*Id.*).  Despite this difficulty, her overall cognitive processing was in the high average range, with particular strength in auditory interactive processing.  (*Id.*).  Danielides opined that Miller should be permitted to retake the EMT test with accommodations, including auditory presentation of the testing materials.  (*Id.*).

### 3. <u>Richard K. Lyons, PhD</u>

On November 9, 2011, agency medical consultant Richard K. Lyons ("Lyons"), PhD, completed a Psychiatric Review Technique.  (Tr. 77-79).  Lyons concluded that Miller's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Lyons, Miller suffered from mild limitations in her activities of daily living and ability to maintain social

functioning and moderate limitations in her ability to maintain concentration, persistence or pace. (*Id.*).  According to Lyons, Miller had not suffered from repeated episodes of deterioration.  (*Id.*).

Lyons completed a mental RFC assessment.  (Tr. 82-84).  Lyons opined that Miller suffered from moderate limitations in her ability to remember, understand, and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting.  (*Id.*).  Lyons opined that Miller retained the ability to understand and remember simple routine instructions and work procedures, sustain concentration, persistence and pace to complete simple tasks, interact appropriately with coworkers and supervisors in a setting with limited interpersonal demands, although she might need occasional redirection to hygiene and cleanliness.  (*Id.*).  He further opined that Miller was generally adaptable in a task setting, but would do best if changes were introduced in a gradual manner.  (*Id.*).  He also opined that Miller was able to learn and engage in simple, rote and repetitive tasks and to perform on a sustained basis in a socially appropriate manner.  (*Id.*).

### 4.      George Grubbs, PsyD

On January 30, 2012, agency medical consultant George Grubbs ("Grubbs"), PsyD, completed a Psychiatric Review Technique.  (Tr. 93-95).  Grubbs concluded that Miller's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Grubbs, Miller suffered from mild limitations in her activities of daily living and her ability to maintain social functioning and moderate limitations in her ability to maintain concentration, persistence

or pace.  (*Id.*).  According to Grubbs, Miller had not suffered from repeated episodes of deterioration.  (*Id.*).

Grubbs completed a mental RFC assessment.  (Tr. 98-101).  Grubbs opined that Miller suffered from moderate limitations in her ability to remember, understand, and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting.  (*Id.*).  Grubbs opined that Miller retained the ability to understand and remember simple routine instructions and work procedures, sustain concentration, persistence and pace to complete simple tasks, interact appropriately with coworkers and supervisors in a setting with limited interpersonal demands, although she might need occasional redirection to hygiene and cleanliness.  (*Id.*).  He further opined that Miller was generally adaptable in a task setting, but would do best if changes were introduced in a gradual manner.  (*Id.*).  He also opined that Miller was able to learn and engage in simple, rote and repetitive tasks and perform on a sustained basis in a socially appropriate manner.  (*Id.*).

### 5.   John D. Bolla, MD

In a letter dated February 14, 2012, Bolla indicated that Miller was his patient and that she had suffered a stroke in 2011.  (Tr. 573).  He opined that Miller was "unemployable" since her stroke.  (*Id.*).

C.      **Application for Benefits**

In her application for benefits, Miller reported that was born in 1962.  (Tr. 197).

According to Miller, she had previously been employed in grocery stores and as a pizza delivery

driver.  (Tr. 211).

Miller reported that she lived with her parents and is able to care for the family's

dog and bird with assistance from her parents.  (Tr. 248-55).  Miller indicated that she is able to

care for her personal hygiene without assistance.  (*Id.*).  She reported difficulty with

concentration and that she walks and thinks more slowly since her 2011 stroke.  (*Id.*).  Miller

reported that she does not prepare meals, but can perform indoor and outdoor household chores

without assistance.  (*Id.*).  Miller leaves her house to walk the dog and is able to drive a car.

(*Id.*).  Miller reported that she is able to shop, but makes impulsive purchases.  (*Id.*).

According to Miller, she is able to pay bills, count change, handle a savings

account, and use a checkbook.  (*Id.*).  During the day she watches television, works on the

computer, and plays card games.  (*Id.*).  She does not socialize with others since her stroke.  (*Id.*).

Miller reported impaired memory, concentration, and understanding since

suffering the stroke.  (Tr. 232-33, 248-55).  According to Miller, she can concentrate for

approximately one hour, but has difficulty finishing things and is not able to follow written

directions, although she can follow oral instructions.  (*Id.*).  She also reported that she gets along

with authority figures, but has difficulty managing stress and changes in routine.  (*Id.*).

Miller's mother, Rose Ann Miller ("Rose Ann"), also completed a function report

in support of Miller's application for benefits.  (Tr. 237-44).  Rose Ann reported that Miller's

thinking and walking have slowed since her stroke and she has difficulty with her memory and

working on the computer.  (*Id.*).  According to Rose Ann, Miller spends her day playing games

on the computer, watching television, playing cards, walking the dog, preparing meals, and completing household chores. (*Id.*). Although Miller is able to feed, bathe and walk the dog, Rose Ann and her husband are the dog's primary caregivers. (*Id.*). Rose Ann reported that Miller does not have difficulty maintaining her own personal hygiene, although she is sometimes not as "careful" with her appearance as she used to be. (*Id.*).

        According to Rose Ann, Miller can prepare her own breakfast and lunch and assists her parents in preparing dinner. (*Id.*). She is able to clean the house, change the beds, prepare meals, wash, mow the lawn, and trim the hedges. (*Id.*). Rose Ann reported that Miller can spend from one to six hours a day performing household chores. (*Id.*). Rose Ann assists Miller by providing encouragement and checking to ensure that the chores are properly completed. (*Id.*).

        Rose Ann reported that Miller leaves the house every few days and is able to drive. (*Id.*). Miller goes shopping approximately once a week for food and other supplies. (*Id.*). She is able to pay bills, count change, handle a savings account and a checkbook, although she is not confident and often rechecks her calculations. (*Id.*). According to Rose Ann, Miller is able to play cards, watch television, and play on the computer "very well." Although she does not socialize with her friends as frequently as she used to, she does leave the house to play cards once a week. (*Id.*).

        Rose Ann reported that Miller has difficulty with memory, completing tasks, concentration, and understanding and following instructions. (*Id.*). According to Rose Ann, Miller often seems distracted and has diminished self-confidence. (*Id.*). Rose Ann opined that Miller could pay attention for "quite awhile," but often becomes distracted and cannot complete tasks. (*Id.*). Rose Ann reported that Miller has difficulty with written instructions, but can

follow spoken instructions. (*Id.*). She also has difficulty dealing with stress and changes in routine. (*Id.*).

> **D.**      **Administrative Hearing Testimony**

During the administrative hearing, Miller testified that she has lived with her parents her entire life. (Tr. 48). According to Miller, she does not believe that she could live on her own. (Tr. 51). Miller testified that she has always been close to her parents and they have always kept her "under their wing." (Tr. 52). Miller assists with household chores, including washing laundry, caring for the family dog, and mowing the lawn. (Tr. 47-48). Miller testified that she owns her own car and is able to drive. (Tr. 48). She has some friends from her previous jobs, and she bowls with her friends in a bowling league once a week. (Tr. 49).

Miller testified that she graduated from high school with a regular diploma. (Tr. 39). Miller testified that she was previously employed as a cashier and a swing shift manager at a gas station. (Tr. 40). She also worked as a hotel room attendant. (Tr. 41). According to Miller, her last job was in a hotel from April to May 2012. (Tr. 42, 192). Miller was laid off due to lack of work. (*Id.*). Prior to that, Miller was employed as a pizza delivery driver. (Tr. 42-43). Miller's employment with that company ended shortly after she suffered a stroke in April 2011. (*Id.*).

Since being laid off from her hotel job, Miller applied for several jobs. (Tr. 43). According to Miller, she did not have any problems with her work as a cashier and, if she were offered a cashier position, she would take it. (Tr. 45). Miller testified that since her stroke she takes longer to process information and sometimes "zone[s] out." (Tr. 46). According to Miller, she is unable to calculate change in her head, but believes she would be able to provide the

correct change with the assistance of a cash register or calculator.  (Tr. 50).  Miller testified that

although she wants to work, she believes that full-time work would be too stressful.  (Tr. 46, 50).

Miller testified that she also suffers from headaches approximately once every

three months.  (Tr. 51).  According to Miller, her prescription medicine is effective in alleviating

her headaches.  (*Id.*).

Miller's mother also testified at the hearing.  (Tr. 54-63).  Rose Ann testified that

Miller has always lived with her parents because she is a slow learner and does not earn enough

money to live on her own.  (Tr. 56).  Additionally, Miller has difficulty trusting others, and

others easily take advantage of her.  (*Id.*).  According to Rose Ann, Miller was placed into

special education classes and was eventually placed back into a regular classroom setting.

(Tr. 57).

Rose Ann testified that Miller's processing has slowed since her stoke and she has

difficulty making decisions, counting change, and playing cards.  (Tr. 57-58).  According to

Rose Ann, Miller is able to drive without getting lost, but sometimes experiences migraines

requiring her parents to come get her.  (*Id.*).

Rose Ann testified that Miller assists with household chores, including mowing

the lawn and vacuuming, but often loses focus and cannot work quickly.  (Tr. 59).  According to

Rose Ann, Miller has made significant efforts to obtain employment since her stroke, but no

employers are willing to hire her.  (Tr. 60).

Rose Ann did not know what caused Miller to threaten to overdose in February

2012, but the psychiatric care Miller received after the episode was helpful.  (Tr. 61).  According

to Rose Ann, Miller is unable to afford ongoing psychiatric care because she is uninsured.  (*Id.*).

Jackson C. McKay ("McKay"), a vocational expert, also testified during the hearing. (Tr. 63-68). The ALJ asked McKay to characterize Miller's previous employment. (Tr. 64) According to McKay, Miller previously had been employed as a cashier and a housekeeper. (*Id.*).

The ALJ asked McKay whether a person would be able to perform Miller's previous jobs who was the same age as Miller, with the same education and vocational profile, who was unable to maintain full-time work because they could not keep up with the pace of the work, be persistent or concentrate sufficiently. (Tr. 65). McKay testified that such an individual would be unable to maintain competitive employment. (*Id.*).

The ALJ asked McKay whether a person would be able to perform Miller's previous jobs who was the same age as Miller, with the same education and vocational profile, who was able to perform light level exertional work, could climb ramps and stairs frequently, balance, stoop, kneel, crouch and crawl occasionally, was unlimited in the use of her upper extremities, and could see, hear, and communicate, but was unable to climb ladders, ropes or scaffolds, should avoid hazards and dangerous machinery, and was limited to jobs involving simple, one-to-two step tasks, that did not require complicated or complex reading or math, or production or pace demands. (Tr. 66). McKay testified that such an individual would be able to perform Miller's previous positions. (*Id.*).

Miller's attorney asked McKay to provide the tolerable absentee rates for those positions. (*Id.*). McKay indicated that a person could be absent at most two times per month in order to maintain employment. (*Id.*). McKay also testified that employees who were off task more than ten percent of the workday would have difficulty maintaining employment. (Tr. 66-67).

19

# DISCUSSION

## I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether

a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v.*

*Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

> (1)  whether the claimant is currently engaged in substantial
>        gainful activity;
>
> (2)  if not, whether the claimant has any "severe impairment"
>        that "significantly limits [the claimant's] physical or mental
>        ability to do basic work activities";
>
> (3)  if so, whether any of the claimant's severe impairments
>        meets or equals one of the impairments listed in Appendix
>        1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)  if not, whether despite the claimant's severe impairments,
>        the claimant retains the residual functional capacity to
>        perform his past work; and
>
> (5)  if not, whether the claimant retains the residual functional
>        capacity to perform any other work that exists in significant
>        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.   **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 16-26).  Under step one of the process, the ALJ found that Miller had not

engaged in substantial gainful activity since April 14, 2011, the alleged onset date.  (Tr. 18).  The

ALJ noted, however, that Miller had worked since the alleged onset date at levels that were

below the substantial gainful activity level.  (*Id.*).  At step two, the ALJ concluded that Miller has

the severe impairments of ischemic heart disease, degenerative disk disease of the lumbar spine,

affective disorder, anxiety disorder, and dyslexia.  (Tr. 18-19).  The ALJ determined that Miller's

COPD, sleep apnea and migraine headaches were not severe.  (*Id.*).  At step three, the ALJ

determined that Miller does not have an impairment (or combination of impairments) that meets

or medically equals one of the listed impairments.  (Tr. 19-20).  With respect to Miller's mental

impairments, the ALJ found that Miller suffered from mild restrictions in activities of daily

living and social functioning and moderate difficulties in maintaining concentration, persistence,

and pace.  (*Id.*).  The ALJ concluded that Miller has the RFC to perform light work, but that she

must avoid climbing ladders, ropes or scaffolds, could frequently climb ramps or stairs, and

balance, stoop, kneel, crouch and crawl occasionally, and must avoid exposure to workplace

hazards.  (Tr. 20).  The ALJ also found that Miller was limited to jobs that involve no more than

simple one-to-two step commands with no production-paced demands and no complicated or

advanced reading or math.  (*Id.*).  At step four, the ALJ determined that Miller was able to

perform past relevant work as a cashier and housekeeping cleaner.  (Tr. 25).  Accordingly, the

ALJ found that Miller was not disabled.  (*Id.*).

B.      **Miller's Contentions**

Miller contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 10-1).  First, Miller maintains that the ALJ's RFC determination is not supported by substantial evidence because the ALJ's decision is not properly supported by any medical opinion of record and the ALJ improperly weighed the medical opinions of record.[5]  (*Id.* at 14-25).  Miller also contends that the ALJ failed to apply the correct legal standards in evaluating her credibility.  (*Id.* at 25-29).  Specifically, Miller maintains that the ALJ improperly considered her activities of daily living in assessing her credibility and mischaracterized her capabilities.  (*Id.*).  Additionally, Miller maintains that the ALJ improperly relied upon her failure to seek psychiatric treatment.  (*Id.*).

II.     **Analysis**

A.      **Mental RFC Assessment**

I turn first to Miller's contention that the ALJ's RFC assessment was flawed.  An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis."  *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R.

---

[5]  In a single sentence in a footnote, Miller maintains that the ALJ failed to adequately explain her step three determination.  (Docket # 10-1 at 15 n.3).  Miller does not contend, and in fact concedes, that the record does not contain evidence that her cognitive impairments satisfied one of the listings.  Further, Miller concedes that her IQ scores are not valid for purposes of meeting the listings.  I conclude that Miller has failed to properly raise this issue, and I need not address it.  In any event, a review of the record provides substantial evidence to support the ALJ's conclusion that Miller's impairments, either singly or in combination, did not meet or equal any of the listings.

§ 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including

medical opinions and facts, physical and mental abilities, non-severe impairments, and

[p]laintiff's subjective evidence of symptoms."  *Stanton v. Astrue*, 2009 WL 1940539, *9

(N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

Miller's challenge to the RFC assessment primarily concerns the medical opinion

evidence of record and the ALJ's evaluation of the relative weight to accord to the various

medical opinions.  (Docket ## 10-1 at 14-25; 12 at 1-6).  The crux of Miller's challenge is that

the ALJ failed to account adequately for Miller's low IQ, purportedly demonstrated by the 2004

intelligence testing performed by Hoffman and Danielides.  (*Id.*).  According to Miller, the ALJ

erred by failing to discuss the results of that intelligence testing and by improperly relying upon

the opinions of Lyons and Grubs.  (*Id.*).  Miller maintains that the ALJ failed to appreciate that

that she suffered from a low IQ prior to her stroke and that her cognitive disabilities declined

further after her 2011 stroke.  (*Id.*).  According to Miller, the ALJ improperly relied upon the

opinions of Lyons and Grubbs because they were not aware of Miller's pre-stroke cognitive

deficiencies.  (*Id.*).

Although the record demonstrates that Miller scored a full-scale IQ of only 62 in

2004, Hoffman, who administered the testing, opined that the score did not accurately reflect

Miller's true cognitive capabilities because it was artificially deflated due to her dyslexic reading

comprehension deficiencies.  (Tr. 579).  Indeed, Danielides, who reviewed Hoffman's report and

conducted an independent evaluation of Miller, opined that Miller's intentional cognitive

processing was in the high average range and her cognitive efficiency was in the low average

range.  (Tr. 575).  According to Danielides, Miller's "academic skills, her ability to apply those

skills, and her fluency with academic tasks are all within the average range."  (Tr. 576).  Further,

24

Danielides opined that Miller's "overall cognitive processing is reported in the high average range." (*Id.*). Simply stated, Miller's protestations of significant cognitive deficiencies are not supported by the single IQ score she cites, the validity of which was questioned by the medical professional who administered the test.

Although Miller attended special education classes for several years, she was placed back into a regular education setting and graduated from high school with a regular diploma. Miller is able to care for her personal hygiene, and assist with household chores, shopping, and caring for family pets. She participates in a weekly bowling league, plays cards with her family, and uses a computer "very well." She is able to drive by herself without getting lost, and indeed worked delivering pizzas both before and after her stroke. She has successfully worked as a cashier and as a housekeeper, and nothing in the record suggests that she was unable to perform any of these positions due to her alleged cognitive deficits. Indeed, Miller testified that she worked both as a cashier and as a shift manager before her stroke.

Miller's own testimony does not support her allegations of debilitating cognitive deficits prior to (or, indeed, after) after her stroke. For instance, Miller did not testify that she was unable to obtain or maintain employment prior to her stroke due to her cognitive deficits. Indeed, Miller testified that she was able to perform as a cashier prior to her stroke. (Tr. 45). According to Miller, she was terminated from her last job (post-stroke) because there was insufficient work, not because of her cognitive inabilities. (Tr. 42). Indeed, Miller continues to actively seek employment and testified that she would accept a position as a cashier if it were offered to her. (Tr. 45). Although Miller has never lived independently, her mother's testimony suggests that her limited financial resources was the principal reason. (Tr. 56).

Although the ALJ did not specifically refer to Hoffman's report,[6] her decision makes clear that she fully evaluated Miller's cognitive abilities in evaluating Miller's RFC, and I conclude that remand is not warranted. *See Jones v. Barnhart*, 2004 WL 3158536, *6 (E.D.N.Y. 2004) ("[t]hat an ALJ must consider all relevant evidence does not mean that the ALJ must specifically address each piece of evidence in [her] decision[;] . . . [i]t is enough that the ALJ noted that [she] carefully considered the exhibits presented in reaching [her] decision, . . . and that the crucial factors in any determination are set forth with sufficient specificity to enable the court to decide whether the determination is supported by substantial evidence") (internal quotations, citations and emphasis omitted). Indeed, the ALJ explicitly noted that Miller contended that she suffered from "a cognitive learning disability," but she nevertheless concluded that Miller's "alleged mental deficits [were] not well-supported by the objective medical evidence." (Tr. 21, 23). Having independently reviewed the record, I find that the ALJ's conclusion is well-supported, as the record as a whole does not support Miller's contention that she suffered from severe cognitive deficiencies either prior to or subsequent to her stroke. Indeed, the record as a whole suggests that Miller was able to function at a level above her alleged deficiencies.

I similarly reject Miller's contentions that the ALJ improperly relied upon the opinions of Lyons and Grubbs. As an initial matter, the law refutes any suggestion that the opinions of non-examining physicians may never constitute substantial evidence to support an RFC determination. *See Miller v. Colvin*, 2015 WL 1431699, *18 (W.D.N.Y. 2015) (citing *F.S. v. Astrue*, 2012 WL 514944, *6 (N.D.N.Y. 2012) ("[a]n ALJ may rely upon the opinions of both examining and non-examining [s]tate agency medical consultants, since such consultants are

---

[6] In fact, the ALJ's conclusion that Miller suffered from dyslexia strongly suggests that she reviewed Hoffman's report because Hoffman was the only doctor in the record to diagnose Miller with dyslexia.

deemed to be qualified experts in the field of Social Security disability[;] . . . the regulations permit the opinions of nonexamining sources to override treating source opinions provided they are supported by evidence in the record")).  Although a medical opinion that would otherwise constitute substantial evidence may be rendered stale or invalid because it is based upon an incomplete record or fails to account for a deterioration in a claimant's impairment, *see Welsh v. Colvin*, 2016 WL 836081, *12 (W.D.N.Y. 2016) (collecting cases), I find that the ALJ properly relied upon the opinions of Lyons and Grubbs.

In this case, Lyons and Grubbs rendered their opinions after Miller had suffered her stroke.  Lyons and Grubbs were fully aware of her stroke and were able to review Miller's treatment notes relating to the stroke and those documenting her subsequent medical care.  After reviewing that medical evidence, both Lyons and Grubbs opined that Miller was capable of performing unskilled work.  That Lyons and Grubbs did not review Miller's IQ results is immaterial because, as described above, the administering physician concluded that the results were not valid and nothing in the record suggests that Miller suffered from severe cognitive deficits prior to her stroke.  Accordingly, I conclude that the ALJ properly relied upon the opinions of Lyons and Grubbs and that those opinions, in addition to the record as a whole, provide substantial evidence to support the ALJ's determination.

Miller also argues that the ALJ failed to follow the treating physician rule because the reasons that the ALJ provided for rejecting Bolla's opinion did not constitute "good reasons" under the rule and because the ALJ failed to recontact Bolla prior to rejecting his opinion. (Docket ## 10-1 at 20-22; 12 at 4-6).  I disagree.

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the

opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must explicitly

consider:

> (1)    the frequency of examination and length, nature, and extent
>          of the treatment relationship,
>
> (2)    the evidence in support of the physician's opinion,
>
> (3)    the consistency of the opinion with the record as a whole,
>
> (4)    whether the opinion is from a specialist, and
>
> (5)    whatever other factors tend to support or contradict the
>          opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010).  The regulations also

direct that the ALJ should "give good reasons in [her] notice of determination or decision for the

weight [she] give[s] [claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at

32 (quoting 20 C.F.R. § 404.1527(c)(2)).  "Even if the above-listed factors have not established

that the treating physician's opinion should be given controlling weight, it is still entitled to

deference, and should not be disregarded."  *Salisbury v. Astrue*, 2008 WL 5110992, *4

(W.D.N.Y. 2008).  The same factors should be used to determine the weight to give to a

consultative physician's opinion.  *Tomasello v. Astrue*, 2011 WL 2516505, *3 (W.D.N.Y. 2011).

"However, if the treating physician's relationship to the claimant is more favorable in terms of

the length, nature and extent of the relationship, then the treating physician's opinion will be

given more weight than that of the consultative examining physician."  *See id.*

          As an initial matter, Bolla's opinion that Miller was "unemployable" reflects a

conclusion that is expressly reserved for the Commissioner.  As such, the ALJ was not obligated

to accord significant weight to Bolla's opinion.  *See Osbelt v. Colvin*, 2015 WL 344541, *3

(W.D.N.Y. 2015) (physician's letter "which concluded that '[claimant] is unable to work in any

significant capacity given ongoing emotional and physical limitations' . . . [did] not specify the nature of such limitations, or describe how they would render plaintiff incapable of work" and thus amounted to a "conclusory opinion concerning the ultimate issue of disability, [a] matter [that] is unquestionably reserved for the Commissioner") (internal quotation omitted); *Wilferth v. Colvin*, 49 F. Supp. 3d 359, 363 (W.D.N.Y. 2014) ("[the doctor's] opinion . . . does not specify any particular limitation on plaintiff's capacity: it is no more than a conclusory opinion on the ultimate issue of disability, which is unquestionably a matter reserved to the Commissioner") (internal quotation omitted); *Thompson v. Colvin*, 2014 WL 7140575, *9 (D. Vt. 2014) (doctor's opinion that claimant was currently unable to work was not entitled to weight; "the opinion[] [is] conclusory and do[es] not list any practical functional consequences of [claimant's] mental impairments, stating merely that 'complications with anxiety, PTSD[,] and agoraphobia' have caused her to be unable to work"); *Emery v. Astrue*, 2012 WL 4892635, *6 (D. Vt. 2012) ("the ALJ was not obligated to afford significant weight to [the doctor's] conclusory opinion that [claimant's] impairments limited 'her ability to hold a full-time job'").

In her decision, the ALJ reviewed Miller's medical records and Bolla's two-sentence opinion.  (Tr. 21-24).  The ALJ stated that she accorded Bolla's opinion "no weight" because it was "inconsistent with his personal treatment notes and [Miller's] longitudinal medical records as a whole."  (Tr. 23).  Specifically, the ALJ noted that these limitations were inconsistent with the medical record, which demonstrated that although Miller suffered from several impairments, they were all well-controlled.  (*Id.*).  She also concluded that Bolla's opinion was inconsistent with his treatment notes reflecting improvement in Miller's health after her stroke.  (*Id.*).  Indeed, during post-stroke appointments, Bolla described Miller's recovery as "great" and specifically noted that she demonstrated no deficits.  (Tr. 550-52).

During subsequent appointments with Bolla, Miller never complained or requested treatment for stroke-related cognitive deficits.  Accordingly, even assuming that Bolla's opinion was not too conclusory to be considered, the ALJ did not violate the treating physician rule by determining to reject it for the reasons she explained.  *See Harrington v. Colvin*, 2015 WL 790756, *16 (W.D.N.Y. 2015) (ALJ properly discounted treating physician opinion where it assessed limitations that were inconsistent with findings contained in the treatment records and with admissions claimant had made concerning his activities of daily living); *Wilferth v. Colvin*, 49 F. Supp. 3d at 362 (ALJ properly weighed treating physician opinion and "adequately explained her reasons for declining to grant controlling weight to his conclusion" where opinion was "inconsistent with other opinions in the record, as well as statements made by the plaintiff himself, and none of the objective test records . . . indicate[d] a level of disability greater than that reflected in the plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*, 2008 WL 4411655, *5 (N.D.N.Y. 2008) (ALJ properly discounted treating physician opinion where it was inconsistent with treatment records and objective findings of consultative examiner).

I similarly reject Miller's contention that the ALJ erred by failing to recontact Bolla to request clarification of his opinion.  (Docket # 10-1 at 21-22).  Although "[i]t is well established in the Second Circuit that an ALJ is under an obligation to develop the administrative record fully, to ensure that there are no inconsistencies in the record that require further inquiry, and to obtain the reports of treating physicians and elicit the appropriate testimony during the proceeding," *Martello v. Astrue*, 2013 WL 1337311, *3 (W.D.N.Y. 2013), the ALJ satisfied her duty in this case.  Here, the record contained other opinions from medical professionals, including Grubbs and Lyons, regarding Miller's ability to perform the mental requirements of work.  "[W]here, as here, the particular treating physician's opinion that is at issue is

unsupported by any medical evidence and where the medical record is otherwise complete, there is no duty to recontact the treating physician for clarification." *Ayers v. Astrue*, 2009 WL 4571840, *2 (W.D.N.Y. 2009).  In any event, the relevant inquiry is whether the record was sufficient to support the ALJ's RFC assessment.  *See Kunkel v. Comm'r of Soc. Sec.*, 2013 WL 4495008, *16 (W.D.N.Y. 2013) ("the issue is whether the record was adequate to permit the ALJ to determine whether or not [p]laintiff was disabled").  As discussed above, I conclude that the record was adequate to support the ALJ's RFC determination.

   I turn next to Miller's contention that the ALJ improperly relied upon the absence of noted work-related limitations in Bolla's and Marion's treatment notes in rendering her RFC determination.  (Docket # 10-1 at 23-25).  Miller argues that the ALJ improperly drew an adverse inference against her based upon the absence of limitations noted by Bolla and Marion.  The record does not support Miller's contention.

   Although Miller correctly notes that an ALJ should not interpret a physician's silence on a particular limitation as an opinion from the physician that the limitation does not exist, *see Cahill v. Colvin*, 2013 WL 4034381, *18 (E.D. Pa. 2013) ("the proper inference from silence about RFC in a treating physician's report is that the issue was not considered") (internal quotations and brackets omitted), my review of the ALJ's decision suggests that this did not occur.  In this case, the ALJ observed that neither Bolla nor Marion, two examining physicians who treated Miller's mental health issues, noted any particular work-related limitations in their treatment notes.  She did so in the course of summarizing the treatment records of Miller's hospitalization in 2011, Bolla's treatment of her in the hospital, his discharge treatment plan, and Marion's treatment notes of her one appointment with her in March 2013.  (Tr. 23-24).  In other words, the ALJ's decision suggests that she merely noted the lack of identified limitations in

assessing the record as a whole.  *See Kennedy v. Comm'r of Soc. Sec.*, 2016 WL 633729, *5

(M.D. Fla. 2016) ("there is nothing prohibiting an ALJ from considering the absence of

functional limitations in treatment notes[,]" particularly where "the ALJ . . . simply relied on

these reasons to bolster his determination to assign [the treating physician's] opinion less than

controlling weight"); *Norris v. Colvin*, 2014 WL 6474038, *8 (N.D. Ind. 2014) ("[t]he ALJ did

not rely on the [consulting examiner's] silence"; "rather, the ALJ relied on [the consulting

examiner's] examination findings and [the treating doctor's] own unremarkable treatment

records to discount [the treating physician]").  Even if the ALJ's observation could be considered

error, at most it was harmless in the context of the entire record, which demonstrated substantial

evidence for the ALJ's determination.

      Miller also contends that the ALJ improperly gave weight to Marion's treatment

notes despite the fact that those notes did not constitute an opinion regarding Miller's mental

ability to perform work-related tasks.  (Docket # 10-1 at 24-25).  While I agree with Miller that

Marion's treatment notes do not contain opinions about her mental ability to perform

work-related tasks, I conclude that any error by the ALJ in according weight to the notes was

harmless.  As described above, Marion's treatment notes reflected that Miller's mental health

had stabilized since her recent hospitalization and that she presented as cooperative and fully

oriented, with appropriate and adequate affect, mood, thought process, memory, concentration,

insight, and judgment.  (Tr. 596).  Nothing in Marion's treatment notes was inconsistent with any

medical opinions of record or with the record as a whole.  Moreover, the ALJ's decision reflects

that she formulated Miller's RFC based upon the entirety of the functional assessment provided

by Lyons and Grubbs, her review of the medical records, and Miller's testimony and statements.

(Tr. 20-25).

The ALJ's RFC finding explicitly required positions involving one-to-two step tasks without production-paced demands or complicated reading or math. This requirement is consistent with both Lyons's and Grubb's opinions that although Miller suffered some mental limitations in her ability to perform work-related tasks, she nonetheless was capable of learning and engaging in "simple, rote and repetitive tasks and perform[ing] on a sustained basis in a socially appropriate manner." (Tr. 84, 101). It is also supported by the medical records and Miller's testimony, which demonstrate that Miller engages in significant daily activities, has been employed since her stroke, and continues to look for employment. Nothing in the record suggests that Miller is unable to perform unskilled work involving no production-paced or complex reading and math requirements. I conclude that the ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

### B.    Credibility Assessment

I turn next to Miller's contention that the ALJ's credibility analysis is flawed because she applied the incorrect legal standards and mischaracterized the record. (Docket ## 10-1 at 25-29; 12 at 6-8).

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that

could produce the relevant symptom.  *Id.* (citing 20 C.F.R. § 404.1529).  Next, the ALJ must

evaluate "the intensity, persistence and limiting effects of the symptom, which requires a

credibility assessment based on the entire case record."  *Id.* (citing 20 C.F.R. § 404.1529(c)).

The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate [his] pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)).

      The ALJ concluded that Miller's statements "concerning the intensity, persistence

and limiting effects of [her] symptoms are not entirely credible."  (Tr. 21).  In doing so, the ALJ

assessed Miller's subjective complaints in the context of a comprehensive review of the entire

record.  I disagree with Miller's contention that the ALJ applied the incorrect legal standard or

mischaracterized the evidence.

      As an initial matter, insofar as Miller suggests that the ALJ was not permitted to

consider her activities of daily living in assessing her credibility, she is incorrect.  (Docket # 10-1

at 25-29).  Although not necessarily determinative as to credibility, the regulations require the

ALJ to consider a claimant's daily activities in assessing credibility.  20 C.F.R.

§§ 404.1529(c)(3)(i)-(vii).  In her decision, the ALJ considered the entire record, including

Miller's daily activities and her history of treatment, along with the other factors described

above.  Further, I disagree to the extent that Miller contends that the ALJ mischaracterized her

activities of daily living in evaluating her credibility.  (Docket # 10-1 at 27-28).

Miller maintains that the ALJ improperly characterized Miller as an "independent,

functioning 50 year old woman," rather than as a woman who is unable to engage in significant

activities and is dependent upon her parents.  (*Id.* at 27).  First, the ALJ never characterized

Miller as an "independent functioning" individual; rather, she stated that the claimant could

independently attend to her personal care needs, prepare simple meals, drive, shop, and complete

household chores.  (Tr. 24).  Second, although Miller disputes the ALJ's characterization of her

daily activities, she does not identify a single factual error in the ALJ's recitation.  Instead, she

simply disagrees with the ALJ's conclusions; in essence, Miller "invite[s] the court to re-weigh

evidence and come to a different conclusion than did [the] ALJ."  *Martin v. Colvin*, 2016 WL

1383507, *11 (N.D.N.Y. 2016) (internal quotation omitted).  "That invitation must be declined,

since a reviewing court defers to the Commissioner's resolution of conflicting evidence." *Id.*

Miller also maintains that the ALJ improperly discounted her credibility because

she did not have a significant history of mental health treatment.  (Docket # 10-1 at 28-29).

According to Miller, the ALJ failed to consider Miller's mother's testimony that Miller did not

have insurance and was unable to afford ongoing psychiatric care.  (*Id.*).  As an initial matter, the

regulations specifically permit the ALJ to consider a claimant's treatment history in evaluating

credibility.  20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v).  Further, my review of the ALJ's

decision does not suggest that she discounted Miller's credibility because she was not receiving

psychiatric treatment.  Rather, the ALJ noted that her anxiety and depression were

well-controlled by medications prescribed by her primary care physician, even without further

treatment.  (Tr. 22).  The ALJ acknowledged that despite Miller's complaints of debilitating

cognitive deficits stemming from her stroke, Miller never complained of those deficits to her primary care physician or to any other mental health provider.  (Tr. 23).

In any event, even if the ALJ did err, her credibility finding is supported by other substantial evidence in the record.  *Medick v. Astrue*, 2012 WL 5499445, *5 (N.D.N.Y. 2012) (although ALJ did not acknowledge that claimant's failure to seek treatment could be explained by lack of insurance, ALJ's credibility determination was otherwise supported by substantial evidence).  As described in detail above, the record demonstrates that Miller could care for her personal hygiene and family pets, clean, prepare simple meals, shop, drive, manage money, use the computer, participate in a weekly bowling league, play cards and had been employed successfully as both a cashier and in housekeeping.  Although she contends that she has had difficulty focusing and sometimes needs redirection since her stroke, she believes that she is capable of working, although not at full-time capacity.  Indeed, she has been employed since her stroke, and nothing in the record suggests that she was unable to perform the requirements of that position due to cognitive deficits.

In sum, I conclude that the ALJ applied the proper legal standards in analyzing Miller's subjective complaints and that substantial evidence supports the ALJ's determination that Miller's complaints were not entirely credible for the reasons stated in her decision.  *See Luther v. Colvin*, 2013 WL 3816540, *7 (W.D.N.Y. 2013) (ALJ properly assessed subjective complaints where she "reviewed all of [p]laintiff's subjective complaints . . . [and] properly considered [p]laintiff's activities of daily living, inconsistent testimony and how her symptoms affected her attempts at maintaining a job").

## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**.  Miller's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Miller's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated:	Rochester, New York
	August 25, 2016